UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHOCTAW NATION OF OKLAHOMA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ALEX M. AZAR II, ) <br> ) <br> Defendant. ) <br>  ) | Civil Action No. _____ |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S COMBINED
MOTION FOR PRELIMINARY INJUNCTION
AND FOR EXPEDITED SUMMARY JUDGMENT

Plaintiff Choctaw Nation of Oklahoma (Choctaw Nation) seeks a preliminary injunction and/or expedited summary judgment to forestall the Department of Health and Human Services (HHS) from terminating its five-year grant – in the amount of $1,175,000 annually -- under the Teen Pregnancy Prevention Program (TPPP) on June 30, 2018, at the end of the current budget period.  As this Court ruled on April 19, 2018, in *Policy and Research, LLC v. Department of Health and Human Services*, No. 18-CV-346-KBJ, a case involving the identical issue, HHS's termination of five-year TPPP grants after three years, without any explanation and in violation of the agency's own regulations, is arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706.

## FACTUAL BACKGROUND

The Choctaw Nation is among the recipients of five-year TPPP grants awarded in 2015 by the Office of Adolescent Health (OAH), an office within HHS.  The Choctaw Nation's grant, No. 5 TP1AH000100-03-00, is for $1,175,000 annually.

Pursuant to its TPPP grant, the Choctaw Nation has established the SMART (Set Morals And Resist Temptations) Program which provides evidence-based teen pregnancy prevention education to students in areas with a great need – Oklahoma has the second highest teen pregnancy rate in the United States, and the counties of Choctaw, McCurtain, and Pushmataha have some of the highest teen pregnancy rates in the state of Oklahoma.[1]  The goals of the project are to: reduce the teen birth rate by 10% in those three counties; increase awareness about teen pregnancy prevention in communities; and promote adolescent health.  SMART uses age-appropriate, evidence-based curricula to teach middle school (6th – 8th grades), high school (9th – 10th grades), and Alternative Education students to set personal goals, communicate personal limits to others, and seek parental input to decisions as well as hard facts about pregnancy and sexually transmitted disease prevention.  SMART serves up to 4,400 teenagers each year.  All participating students must have parental consent to participate, and any data collected from youth is completely anonymous.

The Choctaw Nation was one of approximately 80 TPPP grant recipients selected by HHS pursuant to a Funding Opportunity Announcement (FOA) issued in early 2015.  Consistent with the FOA, the initial notice of award to the Choctaw Nation provided that the "project period" for its grant was five years, from July 1, 2015, through June 30, 2020.  Within the project period were five "budget periods," running from July 1 to June 30 of the following year.  The first notice of award was for the budget period from July 1, 2015, through June 30, 2016.

---

[1] The National Teen Birth Rate (2015) was 22.3 per 1,000 females age 15-19; the Oklahoma Teen Birth Rate (2015) was 34.8 per 1,000 females age 15-19; and the Teen Birth Rate for the targeted counties (2014) was 61 (Choctaw); 77 (McCurtain); 78 (Pushmataha) per 1,000 females age 15-19.

In June 2016, the Choctaw Nation received a notice of award of the funds for the budget period from July 1, 2016, through June 30, 2017. Like the 2015 notice, the 2016 notice of award provided that the project period was through June 30, 2020.

In May 2017, following the change in Administration, HHS submitted its budget request to Congress for the Fiscal Year (FY) 2018. In that request, HHS proposed to eliminate the TPPP.

In early July 2017, the Choctaw Nation received a notice of award providing the full funding that had been appropriated in FY 2017 for its third grant year. That notice also advised the grant would terminate two years early, on June 30, 2018. Without further explanation, the notice stated: "This award also shortens the project period to end on June 30, 2018 at the end of this budget year." All other TPPP grantees received similar notices at the same time.

Despite HHS's request to zero-out funding for the TPPP, Congress appropriated funds to continue the program through federal fiscal year 2018. Congress included a TPPP appropriation of $107.8 million in the Consolidated Appropriations Act, 2018, Public Law No: 115-141, which was signed into law March 23, 2018.

## ARGUMENT

I. **HHS Terminated the Choctaw Nation's Grant When It Shortened the Five-Year Period of Performance by Two Years**

   A. **HHS programmatically approved the TPPP grants for five-year periods of performance**

HHS regulations and the HHS Grants Policy Statement demonstrate that the agency approved the TPPP grants for five-year periods, called periods of performance or project periods.

Under the project-period system, successful applications for competitive multi-year grants "are programmatically approved for support in their entirety, but are funded in annual increments called budget periods." HHS Grants Policy Statement at I-34 (Jan. 1, 2007), https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf. The

3

"total time" for which support "has been programmatically approved" is defined as the "project period." *Id.* at B-8. The "project period" generally extends longer than one year: it is divided into one-year budget periods. *Id.* at B-2 (definition of "budget periods"). HHS regulations define "project period" as "period of performance," 45 C.F.R. § 75.2 ("Project period (see Period of performance)"), and in turn define "period of performance" as "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." *Id.* Grantees may incur obligations throughout the project period, and they may pay for those obligations with funding from the current budget period or with "carryover balances" from a prior budget period. *See id.* § 75.309(a).

Thus, budget periods—"intervals of time (usually 12 months each) into which a project period is divided for budgetary and funding purposes," Grants Policy Statement at B-2—are subdivisions of the "period of performance" or "project period." Grantees "are required to submit a non-competing continuation application … as a prerequisite to approval and funding of each subsequent budget period … within an approved project period." *Id.* at I-34; *see also id.* at I-16 (stating that a "non-competing continuation application" is "a request for funding … the second or subsequent budget period within an approved competitive segment"). Unlike new competitive grants, which must be announced in public funding opportunity announcements (FOAs) that include, among other information, the "periods of performance for new federal awards," 45 C.F.R. app'x I to pt. 75; see id. § 75.203, non-competing continuation applications "do[] not compete with other applications for support," Grants Policy Statement at I-16.

The notice of award is the document issued to the grantee that "indicates an award has been made and that funds may be requested from the designated HHS payment system or office." *Id.* at I-33. A notice of award, "showing the amount of Federal funds authorized for obligation … is

4

issued for each budget period in the approved project period." *Id.* Distinguishing between the project period and budget period, the notices of award include the "[a]pproved project period and budget period start and end dates." *Id.*; *see* 45 C.F.R § 75.2 (requiring the agency to "include start and end dates of the period of performance in the Federal award").

HHS issued competitive FOAs for the TPPP grants in 2015. HHS issued a document to accompany the FOAs to answer frequently asked questions from potential applicants. *See* HHS, Frequently Asked Questions for OAH 2015 TPP FOAs, https://www.hhs.gov/ash/oah/sites/default/files/2015-general-tpp-faqs.pdf. In response to the question, "What is a project period versus a budget period?," HHS explained that "[t]he project period is the total time for which support of a project has been programmatically approved by OAH. For budgetary and reporting purposes, funding is provided in annual increments called budget periods." *Id.* at 8. In response to the question, "How many years of funding can a grantee receive?," HHS explained that "[g]rants will be funded in annual increments (budget periods) and are generally approved for a project period of up to five years, although shorter project periods may be approved." *Id.*

Thus, the Choctaw Nation's grant was "programmatically approved" for five years: the notice of award set forth the start and end dates of the five-year project period (July 1, 2015 to June 30, 2020) and separately set forth annual budget periods (July 1 to June 30 of each year). The notice of award included a schedule for reporting by the Choctaw Nation on a quarterly and annual basis, for five full years. Because the "approved project period" for the grant was five years, with budget periods of one year, HHS required the Choctaw Nation to submit non-competing continuation applications for each subsequent budget period. *See* Grants Policy Statement at I-34, I-16.

### B. HHS's decision to shorten the TPPP grants was a termination

HHS regulations provide that a "termination" is the "ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance." 45 C.F.R. § 75.2. Because HHS has ended the Choctaw Nation's TPPP grant "prior to the planned end of period of performance," it has "terminated" the grant within the meaning of its regulations.

HHS regulations provide that a TPPP grant may be terminated prior to the planned end of performance only for the following reasons: (1) "if the non–Federal entity fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of the non–Federal entity." 45 C.F.R. § 75.372(a). None of these conditions exists in this case.

Nonetheless, HHS argues that a decision not to issue future continuation awards is not a termination. This contention with rejected by the Court in *Policy and Research, LLC v. Department of Health and Human Services*, No. 18-CV-346-KBJ. The Court ruled:

> [I]f HHS's programatic approval of a five-year project period subject to a one-year budget period means anything, then it has to mean that the work projects that plaintiffs proposed to the agency in their initial competitive applications were approved prospectively for the ensuing five-year period, notwithstanding the fact that the projects were going to be funded incrementally during one-year budget cycles. And per the regulations, <u>the agency's programatic approval carries forward through the prescribed period of performance so long as Congress appropriates the funds and none of the specific grounds for termination arises</u>.
>
> The agency's suggestion here that despite the five-year programmatic approval that it gave plaintiffs' grant projects, HHS has the authority to repeatedly reevaluate its approval decision on an annual basis in the context of the budgeting process must be rejected not only because it is manifestly inconsistent with the agency's past practices and the realities of federally-funded scientific research projects, but also because it appears nowhere in the plain language of the regulations that unquestionably govern the agency's actions with respect to the grant-making process.
>
> Furthermore, whatever the agency's Grant Policy Statement might be read to mean, when it indicates that <u>HHS</u> may decide not to make a noncompeting continuation award within the current competitive segment, this Court finds

> that HHS did no such thing here. And, instead, it <u>contemporaneously characterized its own actions as shortening plaintiffs' project periods to end on June 30, 2018, which is two years earlier than the period of performance that the agency had previously approved</u>.
>
> All of this considered, <u>this Court believes that there can be no other conclusion but that HHS ended plaintiffs' federal award, in whole or in part, prior to the planned end of the period of performance thereby terminating plaintiffs' grant awards under the regulations</u> and that it did so without explanation, much less a finding of any of the causes that the agency's own regulations prescribe. That is arbitrary and capricious action.

(4/19/18 Tr. at 21-23; emphasis added) (attached as Exh. A).

Likewise, the D.C. Circuit previously rejected a similar argument made by HHS's predecessor, the Department of Health, Education, and Welfare (HEW). *See S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518 (D.C. Cir. 1977). In *Califano*, as here, the grantee was approved for a grant with a five-year project period and five annual budget periods. *Id.* at 519. After HEW notified the grantee that its non-competing continuation application for the third budget period would not be approved, the grantee attempted to appeal the "termination." *Id.* at 521. HEW took the position there that the "administrative decision not to renew this grant at the end of the budget period does not constitute grant termination," and "those rules and regulations governing grant termination … do not apply." *Id.* The court of appeals disagreed. It found that the agency's position was contradicted by the regulatory definition of "termination," *id.* at 527, which covered "the cancellation of Federal assistance, in whole or in part, under a grant at any time prior to the date of completion," 45 C.F.R. § 74.110 (1976). Accordingly, the court held "that the action taken by HEW was a termination" subject to the agency's regulations governing the circumstances in which a grant may be terminated. 574 F.2d at 528.

7

## II. HHS' Termination of the Choctaw Nation's Grant Was Arbitrary, Capricious, and Contrary to Law

"[A]n agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). Accordingly, where, as here, an agency provides no contemporaneous "reasoned explanation" for its decision to terminate a grant, the action is arbitrary and capricious. *See City of Kansas City v. HUD*, 923 F.2d 188, 189, 194 (D.C. Cir. 1991).

Further, it is "axiomatic … that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citations omitted). "[A]n agency is not free to ignore or violate its regulations while they remain in effect," and "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Id.* (internal quotation marks and citations omitted). HHS's grant regulations enumerate the grounds on which HHS can unilaterally "terminate" a grant: (1) "if the non–Federal entity fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of the non–Federal entity." 45 C.F.R. § 75.372(a). None of those grounds is applicable here.

Thus, HHS's action in terminating the Choctaw Nation's TPPP grant was arbitrary and capricious. As the Court concluded in *Policy and Research, LLC v. Department of Health and Human Services*, No. 18-CV-346-KBJ:

> [T]here can be no other conclusion but that HHS ended plaintiffs' federal award, in whole or in part, prior to the planned end of the period of performance thereby terminating plaintiffs' grant awards under the regulations and that it did so without explanation, much less a finding of any of the causes that the agency's own regulations prescribe. That is arbitrary and capricious action.

(4/19/18 Tr. at 22-23; emphasis added).

**III.    The Choctaw Nation Is Entitled to a Preliminary Injunction**

"A party seeking a preliminary injunction must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  In this case, all of these factors support the grant of injunctive relief to the Choctaw Nation.

    **A.    The Choctaw Nation Is Likely To Succeed On The Merits**

For the reasons discussed above, the Choctaw Nation is highly likely to succeed on its claim that HHS's termination of its TPPP grant was arbitrary and capricious.

    **B.    The Choctaw Nation And Its Teenagers Face Irreparable Harm**

"[A] preliminary injunction requires only a likelihood of irreparable injury." *League of Women Voters*, 838 F.3d at 8-9.  Here, both the Choctaw Nation and the teenagers that its SMART Program serves will suffer irreparable harm if the grant is terminated on June 30, 2018.  As set forth in the declaration of Christi Hammons, the SMART Program Director (Exh. B), the heart of the program is a staff of nine persons who currently provide services to some 4,400 teenagers.  The staff uses three different, evidence-based curricula to teach middle school (6th – 8th grades), high school (9th – 10th grades), and Alternative Education students about the benefits of abstinence and prevention of HIV, sexually transmitted infections, and pregnancy.

Each staff member must be trained in all three curricula.  Training courses, which are conducted by outside professionals, can last up to five days for a single curriculum.  The cost of training one staff member is approximately $1300 per curriculum plus travel expenses.  Thus, the total cost of getting one staff member fully trained is approximately $5,000.  Moreover, training

courses in these curricula are not always available. There were a number in 2015 and 2016 in the aftermath of the 2015 TPPP grant awards, but training courses have become much more sporadic in the last year or so.

HHS's announcement that the grant will end on June 30, 2018, has caused a number of the SMART staff to look for other jobs. One staff member left about a month-and-a-half ago to take a new job. Three other staff members may leave within the next couple of weeks to take new jobs. Even if grant funding is restored sometime after these staff members have left, the SMART Program will nonetheless be significantly compromised for a number of months because it will take that amount of time to hire replacement staff members and to train them in all three curricula. During the interim, the loss of trained staff members will cause a significant decrease in the number of teenagers who receive services and/or a significant decrease in the amount of services that the teenagers receive.

These injuries constitute irreparable harm that supports the grant of injunctive relief. The Fourth Circuit has ruled that the denial of federal funding allocated to Virginia's special education program would cause irreparable harm where it would force schools to lay off teachers and discontinue primary education services in order to operate within their appropriated funds. *See Virginia Dept. of Educ. v. Riley*, 23 F.3d 80, 84 (4th Cir. 1994). Similarly, the Seventh Circuit held that the loss of Medicaid funding would cause a provider immediate irreparable harm where the provider would have to lay off dozens of workers, close multiple clinics, and stop serving a significant number of its patients. *See Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dept. of Health*, 699 F.3d 962, 980 (7th Cir. 2012); *see also Temple University v. White*, 941 F.2d 201, 214-15 (3d Cir. 1991).

Courts have found that reductions in Medicaid funding would also cause irreparable injury to patients who face a reduction in the quality of services they receive or a loss of services. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 837 F.3d 477, 501 (5th Cir. 2016); *Nebraska Health Care Ass'n v. Dunning*, 578 F.Supp. 543, 545 (D. Neb. 1983). Likewise, the major funding reduction at issue here would irreparably harm the teenagers being served by the SMART Program by causing a loss of services.

Furthermore, absent a preliminary injunction, the funds appropriated for the TPPP in the Consolidated Appropriations Act, 2018, may be expended on other, new grants which would moot the Choctaw Nation's claim. In response to the 2018 appropriation, OAH has issued two new FOAs for TPPP grants, which require applications to be submitted by June 29, 2018. *See* https://www.hhs.gov/ash/about-ash/news/2018/fy-2018-funding-opportunity-announcements-tpp-factsheet.html. In *City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994), Houston challenged HUD's decision to reduce its FY 1986 grant. Before Houston commenced the action, however, two events occurred: (1) HUD awarded the funds at issue to other grant recipients, thereby exhausting the relevant FY 1986 appropriation; and (2) the FY 1986 appropriation authorizing the grants expired and therefore lapsed. The D.C. Circuit held that these events served as "two independent grounds" for dismissing Houston's claims. "[T]o avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses and seek a preliminary injunction preventing the agency from disbursing those funds." *Id.* at 1427 (emphasis in original). Accordingly, to avoid loss of the grant funds at issue, the Choctaw Nation is entitled to preliminary injunctive relief.

### C. The Balance Of Equities Favors The Choctaw Nation And The Public Interest Favors Injunctive Relief

In cases like this one, where the U.S. Government is the opposing party, the final two

11

factors -- assessing the balance of harms and weighing the public interest -- merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Both of these factors support a grant of injunctive relief in this case.

The balance of the equities tips in the Choctaw Nation's favor "because a preliminary injunction will 'not substantially injure other interested parties.'" *League of Women Voters*, 838 F.3d at 12 (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "[T]he balance of equities may favor a preliminary injunction that serves only to preserve the relative positions of the parties until a trial on the merits can be held." *Texas Children's Hospital v. Burwell*, 76 F.Supp.3d 224, 245 (D.D.C. 2014) (internal quotation marks and citations omitted). Here, a preliminary injunction will simply preserve TPPP grant funding at the level that has been in place for the past three years. HHS cannot contend that it will be substantially injured by continuing to fund the grant at this same level until the merits of the Choctaw Nation's claim are adjudicated.

Furthermore, the Choctaw Nation's high likelihood of success on the merits "is a strong indicator that a preliminary injunction would serve the public interest. There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12 (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511-12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citing *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

## CONCLUSION

WHEREFORE, the Choctaw Nation respectfully requests that this Court grant it expedited summary judgment or else grant a preliminary injunction enjoining the Defendant from terminating the TPPP grant pending the final resolution of this case.

Dated this 25th day of April, 2018.

                                            Respectfully submitted,

                                            HOLLAND & KNIGHT LLP

                              By:     /s/
                                            Steven D. Gordon (D.C. Bar No. 219287)
                                            Philip Baker-Shenk (D.C. Bar No. 386662)
                                            800 17th Street, N.W., Suite 1100
                                            Washington, D.C.  20006
                                            Tel: (202) 955-3000
                                            Fax: (202) 955-5564

                                            *Attorneys for Plaintiff Choctaw Nation*

#56722218_v1